United States District Court
Eastern District of New York

----------------------------------X

United States of America,

   - against -              **Memorandum and Order**

Quanzhong An, Guangyang An, Tian    No. 22-cr-460 (KAM)
Peng, Chenghua Chen, Chunde Ming,
Xuexin Hou, and Weidong Yuan,

          Defendants.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

    A grand jury in the Eastern District of New York indicted
Quanzhong An, his daughter Guangyang An, and several Chinese
government officials for various offenses regarding an alleged
scheme to involuntarily repatriate "John Doe-1" to China.  The
Indictment also charges both of the Ans with a separate scheme
to launder money from China to the United States with the intent
to promote a bank fraud scheme.  The Ans now move to dismiss the
money laundering charges, or alternatively, to try those charges
separately from the other charges.  Ms. An individually moves to
suppress evidence obtained from searches of her residence and
Apple account, or alternatively, to hold an evidentiary hearing
to challenge the validity of the warrants that led to the
searches.  Finally, Ms. An moves for disclosure of parts of the
grand jury minutes.  For the reasons below, the Court grants the

Ans' request to try the money laundering charges separately but otherwise denies their motions.

**Background**

I.    **Factual Background**

For the purposes of resolving the Ans' motion to dismiss, the Court assumes the truth of the following allegations from the Indictment. *See United States v. Benjamin*, 95 F.4th 60, 64 (2d Cir. 2024).

A.    **The Repatriation Scheme**

In 2002, the Chinese government sought to involuntarily repatriate "John Doe-1" ("Doe"), an alleged fugitive from China living in the United States who was accused of embezzling funds from a Chinese state-owned corporation. (ECF No. 9, Redacted Indictment ("Indictment"), ¶¶ 14–15.) Around 2014, the Chinese government began a program called "Operation Fox Hunt," which sought to repatriate fugitives who fled to foreign countries. (*Id.* ¶ 10.) Doe was on China's list of "priority" fugitives targeted as part of Operation Fox Hunt. (*Id.* ¶ 14.) The scheme to repatriate Doe was spearheaded by Tian Peng, Chenghua Chen, Chunde Ming, and Xuexin Hou, all of whom were Chinese government officials and are defendants in this case who have not appeared before the Court. (*Id.* ¶ 16.)

Quanzhong An, assisted by his daughter, Guangyang An, was a "U.S.-based asset for the operation." (*Id.*) Mr. An was a

Chinese citizen who headed several businesses in the United States and China. (*Id.* ¶ 1.) He is a lawful permanent resident of the United States and the former president of a Flushing-based organization that represented people from the Shandong province of China living in the New York area. (*Id.*) One of his businesses owned a hotel in Flushing and another business owned a condominium building in Elmhurst. (*Id.*) Ms. An, his daughter, is an American citizen and worked at the hotel. (*Id.* ¶ 2.)

In October 2017, Mr. An visited Doe's son's Long Island residence, but Doe's son was not home. (*Id.* ¶ 21.)[1] In September 2018, Doe's nephew and Defendant Yuan (his supervisor at work) traveled from China to Chicago with their wives as part of a tourist group after being denied visas to travel by themselves. (*Id.* ¶¶ 22–23.) Instead of flying from Chicago to Hawaii, the next destination on the group's itinerary, Yuan and Doe's nephew departed for the New York area without their wives. (*Id.* ¶ 24.) Once there, they connected with Ms. An and her husband, and the group traveled to Doe's son's Long Island residence. (*Id.* ¶ 25.) After failing to locate Doe or his son,

---

[1] Though not alleged in the Indictment, one of the Government's warrant applications elaborates that Mr. An also visited Doe's son's former residence in July 2017. (ECF No. 149-4 pp. 2–43, Aff. Supp. Appl. Search Warrant, ¶ 25.) The application also notes that around the same time, Defendant Hou sent text messages to Doe's son threatening "forcible measures" against Doe and Doe's son if Doe did not repatriate. (*Id.* ¶¶ 27–28.)

the group left and returned the next day.  (*Id.* ¶¶ 25–26.)
Surveillance footage captured them looking inside windows,
attempting to open doors, taking photographs of the residence,
and looking through the mail.  (*Id.* ¶ 26.)  Yuan left a letter
in the mailbox instructing Doe's son to contact Yuan or Ms. An,
and Ms. An and Doe's nephew attempted to reach Doe's son by
phone.  (*Id.* ¶ 27.)

A few days later, Doe's son met with Doe's nephew at a
Queens restaurant.  (*Id.* ¶ 28.)  The nephew explained that he
was pressured to travel to the United States to track down and
repatriate Doe, and he advised the son to listen to Yuan.  (*Id.*
¶ 29.)  Yuan then entered the restaurant and joined Doe's son
and nephew, warning that although it might not affect Doe's son
because he was living in the United States, Doe's return to
China would "make a difference for the family members [he] still
[had]" in China.  (*Id.* ¶ 33.)  After the meeting, Yuan and Doe's
nephew joined back up with their tourist group in California
using airline tickets Ms. An had purchased for them.  (*Id.*
¶ 34.)

In August 2019, Doe's former son-in-law emailed Doe's
daughter mentioning that Defendant Peng stopped him at a train
station in China and told him to inform Doe that the Chinese
government was "very serious" about repatriating fugitives
abroad and had a "clear picture" of Doe's and his family's

4

circumstances.  (*Id.* ¶¶ 36–37.)  Peng also explained that
Mr. An, a "patriotic businessman" in the United States and "head
of the Chinese Business Association of New York," had given
"strong support to the government's work" and was willing to pay
for the loss Doe caused to the Chinese government and Doe's
expenses to return home, all with the Chinese government's
acknowledgment.  (*Id.* ¶ 37.)

    In November 2019, Mr. An flew from Beijing to Queens to
meet with Doe's son.  (*Id.* ¶ 42.)  Mr. An informed Doe's son
that Mr. An served on the Standing Committee of the Chinese
People's Political Consultative Conference, which enforces the
Chinese Communist Party's "rules and regulations" abroad.  (*Id.*)
Mr. An told Doe's son that the Conference was trying to contact
Doe and that he had offered to help.  (*Id.* ¶ 43.)  Mr. An
mentioned his 2017 trip to Doe's son's residence, explaining
that he received Doe's son's address from the Chinese
government.  (*Id.*)  He offered to pay the money Doe purportedly
embezzled, which supposedly would permit Doe to return to China
without being detained.  (*Id.* ¶ 45.)  When asked why he was
willing do this, Mr. An responded that the Chinese government
would be "very happy if this thing [was] settle[d]" and that it
would not see Mr. An "as a bad guy" because of all the "good
things" he did for the country.  (*Id.* ¶ 46.)  Finally, Mr. An
warned Doe's son that Defendant Chen would "keep pestering" him

and "make [his] daily life uncomfortable" if Doe did not return
home and also warned that the Chinese government had "targeted
and monitored" Doe's relatives in China.  (*Id.* ¶ 47.)

In June 2021, Mr. An again flew from Beijing to Queens and
met with Doe's son.  (*Id.* ¶¶ 48-49.)  At their July 1, 2021,
meeting, Mr. An offered to put Doe's son in touch with another
Chinese fugitive, who had charges against him dropped after he
fled to Canada but later agreed to repatriate.  (*Id.* ¶ 49.)
Mr. An repeated his offer to cover Doe's fine and expenses if he
returned to China, promising that Doe would not be detained.
(*Id.* ¶ 51.)  Mr. An had additional meetings with Doe's son and
reiterated essentially the same themes a few weeks later and
again in June 2022.  (*Id.* ¶¶ 53, 59-63.)

About a week after the June 2022 meeting, Mr. An called
Doe's son to arrange a call with Doe's son and a Chinese
government official at Mr. An's hotel.  (*Id.* ¶ 64.)  The next
day, Doe's son met Mr. An at the hotel, where Mr. An called
Defendant Peng on speakerphone.  (*Id.* ¶ 65.)  Peng informed
Doe's son that he had a "very good relationship" with Mr. An and
that the terms of Mr. An's proposal to cover Doe's fine would be
reduced to a contract.  (*Id.* ¶¶ 66-67.)  He implied more threats
against Doe and his family and confirmed that Doe would not be
detained or be forced to surrender any assets if he were to
return.  (*Id.* ¶¶ 68-69.)  After further discussion about the

terms of the arrangement, Doe's son promised to consult with Doe and respond to Mr. An.  (*Id.* ¶¶ 70-71.)

In August 2022, Doe's son met Mr. An in Queens again, and Mr. An provided him the Canadian victim's contact information. (*Id.* ¶ 72.)  Mr. An then called Peng again, with Doe's son present, and Peng informed Doe's son that he was free to contact the Canadian victim to discuss how his case was handled, suggesting the process for Doe would work the same way.  (*Id.* ¶¶ 73-74.)  After the call, Mr. An assured Doe's son that Doe would be "exonerated" and could return to the United States after the matter was "resolved," and Mr. An offered to arrange a meeting with the Canadian victim.  (*Id.* ¶ 77.)  Later that month, Doe's son called the Canadian victim, who stated he was neither detained nor mistreated when he returned to China.  (*Id.* ¶¶ 78-79.)  The Canadian victim elaborated that "[t]he process included an arrest" and an "adjudication of guilt without punishment," that his "case was closed" in China, and that he "returned to Canada after the verdict" without being bothered again.  (*Id.* ¶ 79.)

B.   **The Money Laundering Scheme**

The Indictment also charges the Ans with conspiring with unnamed individuals to execute a money laundering scheme.  (*Id.* ¶ 82.)  It alleges that since 2016, the Ans sent millions of dollars in wire transfers from China to the United States in

7

violation of Chinese capital flight regulations, which imposed an annual per-person limit of $50,000 for "total foreign exchange settlement."  (*Id.*)

The conspirators "engaged in deceptive tactics" to frustrate American banks' anti-money laundering controls so that they could "enjoy continued access" to American bank accounts. (*Id.*)  For example, the conspirators used third parties to send money in quantities less than $50,000 from China to individuals and entities in the United States.  (*Id.* ¶ 84.)  The conspirators then received funds wired from China in personal accounts associated with the Ans and their relatives.  (*Id.* ¶¶ 84-85.)  The conspirators allegedly falsely stated to the banks the purposes of the transactions in "Originator to Beneficiary Information" ("OBI") messages, which American banks processing international monetary transactions regularly screened to avoid executing transactions in violation of foreign law.  (*Id.* ¶¶ 83-84.)  The conspirators also engaged in "layering transactions" involving the conspirators' personal and corporate accounts.  (*Id.* ¶ 84.)  Finally, they lied to American banks when asked about the purposes of the transactions.  (*Id.*) These deceptive tactics caused American banks to "incur risk of civil and criminal liability."  (*Id.*)

The Ans used the transferred funds for personal and business expenses, including paying credit card debt, mortgages

8

on their New York residences, mortgages on Mr. An's hotel, and tax liability. (*Id.* ¶ 86.)

## II.  Procedural Background

### A.    The Warrants and Indictment

On November 18, 2021, Magistrate Judge Henry issued a warrant authorizing a digital search of the Ans' Apple accounts for evidence of acting as a foreign agent without authorization, kidnapping, and stalking. (ECF No. 149-4 pp. 44–52, Search & Seizure Warrant ("Apple Warrant").)  To obtain the warrant, FBI Special Agent Jason Moritz provided background on Operation Fox Hunt, the defendants, and the scheme to repatriate Doe. (ECF No. 149-4 pp. 2–43, Aff. Supp. Appl. Search Warrant ("Apple Aff."), ¶¶ 8–73.)  As to Ms. An's involvement, Agent Moritz attested that Chinese government officials "directed" her to help repatriate Doe. (*Id.* ¶¶ 19, 43.)  Agent Moritz's affidavit further described how Doe's nephew advised Doe's son that the Chinese government paid for his travel and that when he and Yuan arrived in the United States, Yuan contacted Ms. An and they reviewed the WeChat account of Doe's son together. (*Id.* ¶ 43.)  Ms. An then met Yuan and Doe's nephew and "provided them" with Doe's son's contact information and his photograph "to identify" him. (*Id.*)  Agent Moritz also described how Ms. An drove Yuan and Doe's nephew to Doe's son's residence in September 2018, where surveillance footage showed Ms. An "look inside [Doe's

son's] windows, attempt to open the front door, . . . attempt[]
to open the back door, and take photographs on [her]
telephone[]" as well as Ms. An "taking out two pieces of mail"
and then putting them back inside Doe's son's mailbox.  (*Id.*
¶¶ 35, 43.)  The surveillance footage also appeared to show
Ms. An using her iPhone to send a text message and showed Yuan
taping a letter to the front door and then putting it in the
mailbox.  (*Id.* ¶¶ 36–37.)  The letter instructed Doe's son to
contact Ms. An or Doe's nephew and listed their phone numbers.
(*Id.* ¶ 37.)  Toll records confirmed that Ms. An called Doe's son
multiple times that day from the iPhone number that the note
listed.  (*Id.* ¶ 38.)  Law enforcement submitted the warrant to
Apple on November 22, 2021, and received returns on December 9,
2021.  (ECF No. 129, Nov. 24, 2023, Ltr. from M. Arfa
("Execution Ltr."), 1.)  The returns became available for review
on December 21, 2021, and the Government began reviewing them
that day.  (*Id.*)

A grand jury indicted the Ans, Peng, Chen, Ming, Hou, and
Yuan on October 7, 2022.  (*See generally* Indictment.)  Count One
of the Indictment charges all defendants except Ms. An with
conspiring to act as agents of the Chinese government in the
United States without authorization.  (*Id.* ¶¶ 87–89.)  Count Two
charges Mr. An and Yuan with acting as agents of the Chinese
government in the United States without authorization.  (*Id.*

10

¶¶ 90–91.)  Counts Three through Six charge Mr. An and Yuan with travelling to the United States on various occasions to facilitate extortion in violation of New York criminal law and the federal Travel Act.  (*Id.* ¶¶ 92–99.)  Count Seven charges all defendants with conspiring to engage in interstate harassment.  (*Id.* ¶¶ 100–02.)  Count Eight charges the Ans with engaging in a money laundering conspiracy.  (*Id.* ¶¶ 103–04.)

Magistrate Judge Levy issued three additional search warrants on October 13, 2022.  One, which authorized a digital search of Ms. An's Google account, yielded no responsive material and is not directly challenged in the present motions. (*See* ECF No. 149-6 pp. 2–11, Search & Seizure Warrant; ECF No. 130.)  The other two warrants authorized physical searches of the Ans' residences and digital searches of any electronic devices inside the residences.  (ECF No. 149-5 pp. 2–11 ("Residence Warrants").)  With respect to the search of Ms. An's residence and devices, the subject offenses were interstate stalking and money laundering.  (*Id.* 5.)  To obtain the residence warrants, Agent Moritz attached a copy the Indictment and attested to facts similar to those he included in his affidavit in support of the Apple warrant.  (*See generally* ECF No. 149-5 pp. 12–79, Aff. Supp. Appl. Search Warrant ("Residence Aff.").)  He also attested to electronic communications searched in accordance with the Apple warrant.  (*Id.* ¶ 12.)

11

B.    **Execution and Production**

Law enforcement executed the residence warrants on October 20, 2022.  (*See* Execution Ltr. 3.)  During the search of Ms. An's residence, officers seized three iPhones, two MacBooks, and a SIM card, and they conducted a preliminary manual review of one of the iPhones that day.  (*Id.* 3–4.)  Officers submitted the devices for processing on October 25, 2022, and began reviewing the data from the devices when the data became available for review on October 27, 2022.[2]  (*Id.* 4.)

On November 4, 2022, the Government made its first discovery production, which included information regarding Mr. An's finances.  (ECF No. 43.)  The Government produced information associated with the Ans' Apple accounts on November 21, 2022.  (ECF Nos. 55–56.)  On December 20, 2022, the Government produced draft translations of recorded conversations between Mr. An, Doe's son, and Peng.  (ECF No. 63.)  On January 18, 2023, it produced returns from its search of the Ans' electronic devices, audio recordings of the conversation between Doe's son and the Canadian victim, an audio recording of the conversation between Doe's son and Yuan, video footage of Mr. An's 2017 visit to Doe's son's residence, and surveillance footage of Ms. An, Yuan, and Doe's nephew at Doe's son's

---

[2] The one exception was Ms. An's MacBook Air, which officers could not access and did not begin reviewing until September 29, 2023, due to technical issues.  (Execution Ltr. 4.)

residence in 2018.  (ECF Nos. 66–67.)  On February 3, 2023, the
Government produced draft transcripts of audio recordings of the
2022 conversations between Mr. An and Doe's son, the search
warrants, and the warrant applications.  (ECF Nos. 77–78.)  It
produced additional draft translations on March 31, 2023,
records from Doe's son's electronic devices on April 27, 2023,
and on June 12, 2023, a summary translation of WeChat
communications between Ms. An and Yuan.  (ECF Nos. 82, 87, 103.)

The Ans made general discovery requests to the Government
by letter on July 20, 2023.  (ECF No. 107-1.)  They sent a
follow-up letter on September 13, 2023, requesting documents the
parties agreed the Government would produce on a phone call,
which included returns from the Google search, subpoenaed
financial documents, returns from the search of Ms. An's
devices, and Chinese-language documents that had yet to be
translated.  (ECF No. 112.)  The Ans wrote to the Government
again on September 21, 2023, with more specific questions,
primarily regarding the money laundering charges.  (ECF
No. 113.)  The next day, the Government produced returns from
the search of Ms. An's iPhone, responsiveness reports from the
iPhone searches, and records from various third parties.  (ECF
No. 114.)  At a status conference, the Court ordered the
Government to make additional productions.  (Minute Entry,
Sept. 27, 2023).  The Government produced returns from the

search of Ms. An's Google account on September 29, 2023, responsiveness reports from searches of her iPhones on October 27, 2023, and additional returns from the search of her Apple account on November 9, 2023.  (ECF Nos. 117, 123-24.)

Ms. An's counsel wrote to the Government on October 4, 2023, seeking information about how the warrants were executed and the status of the Government's review.  (ECF No. 119.)  The Government responded on October 11, 2023, explaining that it had produced the "complete set of data provided by Apple and Google" and the "complete forensic images" of Ms. An's devices.  (ECF No. 121.)  The Government noted it anticipated producing an image of Ms. An's MacBook Air and additional responsiveness reports but objected to providing more specific information about the warrants' execution.  (*Id.*)

At a subsequent status conference on November 20, 2023, however, the Court ordered the Government to respond to most of Ms. An's questions and provide a responsiveness report regarding the Google search returns.  (Minute Entry, Nov. 20, 2023.)  The Government wrote to Ms. An answering her questions on November 24, 2023, and informed her on December 1, 2023, that it did not identify any responsive materials from the Google warrant.  (ECF Nos. 129-30.)  The Government produced additional third-party materials on December 21, 2023, and January 14, 2024.  (ECF Nos. 134-35.)

14

At a status conference on January 16, 2024, the Government advised that discovery was nearly complete, and the Court set a briefing schedule on the present motions.  (Minute Entry, Jan. 16, 2024.)  On January 19, 2024, the Government produced an image and responsiveness report of Ms. An's MacBook air and an image of Yuan's laptop.  (ECF Nos. 139–40.)  It produced additional bank records on February 16, 2024.  (ECF No. 141.)

Before the motion deadline, the Government provided additional information regarding the money laundering charge. First, it provided a chart of the transactions it expected to prove at trial regarding Count Eight.  (ECF No. 142.)  Second, it clarified that its theory was "not premised on the violation of a foreign government's laws" but rather on the Ans' alleged "deceptive tactics designed to frustrate and impede the Anti-Money Laundering ('AML') controls of the U.S. financial institutions" and thereby "enjoy continued access to the U.S.-based bank accounts."  (ECF No. 143 (quoting Indictment ¶ 82) (emphasis removed).)

Finally, in response to Ms. An's request, the Government on February 27, 2024, provided a "limited evidentiary proffer" in support of its position that the Chinese government "directed" Ms. An to assist in Doe's repatriation.  (ECF No. 145.)

## Discussion

The Ans filed the instant motion to dismiss or sever the

15

money laundering charges and motion to suppress the fruits of
the Apple and residence searches on February 29, 2024.  (ECF
No. 147, Notice of Pretrial Mots. of Defs. Guangyang An &
Quanzhong An.)  With the motion papers, however, Ms. An included
a letter reserving her right to seek a hearing under *Franks v.
Delaware*, 438 U.S. 154 (1978), depending on the Government's
response to her request for more information as to how the
Chinese government "directed" her to assist in the repatriation
scheme.  (ECF No. 151.)  The Government responded to the letter
on March 8, 2024, (ECF No. 153), and Ms. An, finding the
response unsatisfactory, filed a supplemental brief on March 15,
2024, requesting a *Franks* hearing and disclosure of the grand
jury minutes, (ECF No. 155, Suppl. Mem. Supp. Guangyang An's
Mot. Suppress & for Grand Jury Materials ("Suppl. Mem.")).

I.   **Motion to Dismiss Count Eight**

The Ans move to dismiss Count Eight for failure to allege a
violation of the federal money laundering statute.  (ECF
No. 154, Corr. Mem. Supp. Pretrial Mots. of Defs. Guangyang An &
Quanzhong An ("Mem."), 9-22.)  The Government charged the Ans
under the provision of the statute that criminalizes the
transfer of funds into the United States with the intent to
"promote the carrying on of specified unlawful activity."  *See*
18 U.S.C. § 1956(a)(2)(A).  The "specified unlawful activity"
alleged in this case is bank fraud.  (Indictment ¶ 104); *see*

16

18 U.S.C. §§ 1956(c)(7)(A), 1961(1), 1344(1).  The money laundering charges thus rely on the validity of the Government's bank fraud theory.  *See United States v. Davidson*, 308 F. Supp. 2d 461, 488 n.16 (S.D.N.Y. 2004).

A party to a criminal case may raise by pre-trial motion any "defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1). Such motions include motions to dismiss a charge for "lack of specificity" or "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(iii), Fed. R. Crim. P. 12(b)(3)(B)(v).  To state an offense, the indictment must include a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  This standard is "not demanding."  *United States v. Aquart*, 92 F.4th 77, 89 (2d Cir. 2024) (quoting *United States v. Balde*, 943 F.3d 73, 89 (2d Cir. 2019)).  The indictment generally need only recite the language of the charging statute and state the approximate time and place of the alleged crime.  *Id.*  It will not fail for lack of specificity so long as it includes enough detail for the defendant to raise a double jeopardy challenge in a future prosecution based on the same alleged conduct.  *United States v. Bout*, 731 F.3d 233, 240-41 (2d Cir. 2013).  The higher "plausibly" pleading standard from civil litigation does not apply in criminal cases.  *United States v. Kelly*,

462 F. Supp. 3d 191, 198 (E.D.N.Y. 2020).

In resolving a motion to dismiss a charge, the court assumes the truth of the indictment's factual allegations. *United States v. Benjamin*, 95 F.4th 60, 64 (2d Cir. 2024). If resolving the motion would require the court to decide a factual dispute that intertwines with the ultimate issue of guilt or innocence, the court must defer deciding that dispute until after the trial. *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018). There is no criminal equivalent of the summary judgment procedure from civil litigation, so a criminal defendant generally cannot test the sufficiency of the government's evidence before trial. *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021). A court may dismiss a charge before trial for insufficient evidence only if the government makes a full proffer of the evidence it intends to introduce at trial, which the court cannot compel it to do. *Id.*

The Ans advance three arguments against Count Eight, the first two attacking the Government's bank fraud theory and the third attacking its broader money laundering theory. First, the Ans argue that Count Eight fails to allege that the object of the alleged fraud was to deprive banks of "property," a necessary element of bank fraud. (Mem. 13–17.) Next, they argue that even if Count Eight alleges a scheme to deprive "property," it lacks sufficient detail regarding *how* the Ans'

18

conduct could have harmed the banks.  (*Id.* 17–20.)  Finally, they argue that even if the Indictment sufficiently alleges bank fraud, it still fails to allege money laundering because the alleged bank fraud was carried out by transferring funds into the United States and a defendant's transfer of funds cannot "promote" the transfer itself.  (*Id.* 20–22.)  The Court respectfully rejects all three arguments.

   A.   **Legal Sufficiency of the Bank Fraud Theory**

   The Indictment sufficiently alleges a bank fraud scheme. The applicable statutory provision criminalizes "knowingly execut[ing]" or "attempt[ing] to execute" a "scheme or artifice . . . to defraud a financial institution."  18 U.S.C. § 1344(1). To state a bank fraud offense under this provision, the government must allege that the defendant (1) knowingly executed or attempted to execute a scheme to deceive a bank (2) through a misrepresentation or concealment of a material fact (3) and thereby deprive the bank of something of value (4) with knowledge that the defendant likely would harm the bank's property interest through the scheme.  *United States v. Weigand*, 482 F. Supp. 3d 224, 234–35 (S.D.N.Y. 2020).  The Indictment here tracks those elements by alleging that the Ans "conspired with others" to "engage[] in deceptive tactics" to evade American banks' anti-money laundering controls and thereby "enjoy continued access" to American bank accounts.  (Indictment

¶ 82.)  Although the Indictment does not explicitly state that the Ans knew their conduct likely would harm the banks' property interests, the facts alleged permit a reasonable inference that they did.  *See United States v. Simmons*, No. 08-cr-1280 (VEC), 2020 WL 6381805, at *6 (S.D.N.Y. Oct. 29, 2020).

The Ans argue that "continued access" to American bank accounts is not "something of value."  (Mem. 13–17.)  Rather, they contend, the Government's "continued access" allegations reflect a "right to control" theory of fraud the Supreme Court rejected in *Ciminelli v. United States*, 598 U.S. 306 (2023).  (*Id.*)  *Ciminelli* reversed a Second Circuit decision affirming a conviction for wire fraud and wire fraud conspiracy where the defendant helped rig a bidding process for government contracts to ensure his construction business would be awarded the contracts.  598 U.S. at 309.  The district court had instructed the jury that "property" in the federal bank fraud statute includes "intangible interests" including the "right to control the use of one's assets" and that the jury could find the defendant harmed that interest if he deprived the victim institution of "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Id.* at 311.  The Second Circuit then affirmed based on circuit law providing that the federal wire fraud statute criminalizes "den[ying] [a] victim the right to control its assets by

depriving it of information necessary to make discretionary economic decisions." *United States v. Ciminelli*, 13 F.4th 158, 170 (2d Cir. 2021) (quoting *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).  The Supreme Court reversed, explaining that the statute criminalizes only schemes to deprive "traditional property interests," *Ciminelli*, 598 U.S. at 309, and concluding that the "right to valuable economic information needed to make discretionary economic decisions" is not such an interest, *id.* at 316.  Although *Ciminelli* itself concerned the propriety of a jury instruction under the federal wire fraud statute, the opinion spoke in terms of "the federal fraud statutes," so its requirement that a fraud scheme deprive the victim of a "traditional property interest" would appear also to apply to the federal bank fraud statute.  *Id.* at 309.

In the context of Ms. An's motion to dismiss the Indictment, *Ciminelli* is inapposite.  *Ciminelli* concerned an "instructional error, not the sufficiency of an indictment." *United States v. Xu*, No. 23-cr-133 (JMF), 2024 WL 1332548, at *2 n.1 (S.D.N.Y. Mar. 28, 2024); *see Ciminelli*, 598 U.S. at 317 (Alito, J., concurring) ("I do not understand the Court's opinion to address . . . the indictment's sufficiency . . . .").  Although the Government obtained the Indictment in this case before the Supreme Court decided *Ciminelli*, the Indictment in this case does not rely on an informational harm as the

21

indictment and jury instructions in *Ciminelli* did.  *See*
Superseding Indictment, ECF No. 321 ¶¶ 39, 45, *United States v.
Ciminelli*, No. 16-cr-776 (VEC) (S.D.N.Y. Sept. 19, 2017)
(alleging defendant "devised a scheme to defraud [victim] of its
right to control its assets"); July 10, 2018, Trial Tr. 2884:16–
25, ECF No. 821, *United States v. Ciminelli*, No. 16-cr-776 (VEC)
(S.D.N.Y. July 24, 2018) (instructing jury it could find a
deprivation of property if it found victim was deprived of
"information that affects the victim's assessment of the
benefits or burdens of a transaction" or "relates to the quality
of goods or services received or the economic risks of the
transaction").

     Instead, the Indictment in this case frames the harm to the
banks as the Ans' deprivation of deposited funds in accounts
held by the victim banks.  (Indictment ¶ 82.)  That distinction
matters.  The government in *Ciminelli* relied *entirely* on an
informational harm theory and did not attempt to convict the
defendant for defrauding the state out of "a traditional form of
property, viz., valuable contracts."  *See Ciminelli*, 598 U.S. at
317–18 (Alito, J., concurring).  In fact, one district court, in
a decision this Court finds persuasive, recently rejected a
post-trial *Ciminelli* challenge where the court had instructed
the jury that it "needed to find that the defendants 'intended
to deprive' the victim . . . 'of money or property or [to] bring

22

about some financial gain to the person engaged in the scheme'"
and there was "sufficient evidence for the jury to find beyond a
reasonable doubt that the 'object of the fraud' was an unduly
lucrative contract." *See United States v. Venkata*, No. 20-cr-66
(RDM), 2024 WL 86287, at *10 (D.D.C. Jan. 3, 2024).  As the
Supreme Court explained in *Shaw v. United States*, 580 U.S. 63,
72 (2016), a "plan to deprive a bank of money in a customer's
deposit account" similarly implicates a property interest.

The Ans acknowledge *Shaw* but counter that the bank's
property interest cannot operate "*against the owner of the
account*."  (ECF No. 160, Reply Mem. Supp. Pretrial Mots. of
Defs. Guangyang An & Quanzhong An ("Reply"), 6.)  In support,
they quote language from *Shaw* analogizing certain customer-bank
relationships to bailor-bailee relationships, wherein "the bank
'can assert the right to possess the deposited funds against all
the world but for the bailor.'"  (*Id.* (quoting *Shaw*, 580 U.S. at
66) (emphasis removed).)  The Indictment does not allege that
the Ans "owned" all the accounts at issue, however.  It alleges
that the Ans were among the "initial recipients" of the
international transfers, along with the Ans' family members and
an "associate," and that the Ans and their co-conspirators
"controlled the laundered funds."  (*See* Indictment ¶¶ 85-86.)

Moreover, the Ans' argument misunderstands *Shaw*'s broader
theory of how a bank holds a property interest in its customer's

deposit.  Under *Shaw*, a bank's right to deposited funds depends on the nature of the contract between the bank and the customer, and the resulting contractual relationship "ordinarily" makes the bank the "owner of the funds":

> When a customer deposits funds, *the bank ordinarily becomes the owner of the funds* and consequently has the right to use the funds as a source of loans that help the bank earn profits (though the customer retains the right, for example, to withdraw funds). *Sometimes*, the contract between the customer and the bank provides that the customer retains ownership of the funds and the bank merely assumes possession.  But even then the bank is like a bailee, say, a garage that stores a customer's car.  And as bailee, the bank can assert the right to possess the deposited funds against all the world but for the bailor (or, say, the bailor's authorized agent).

*Shaw*, 580 U.S. at 66 (citations omitted) (emphasis added).  *Shaw* thus does not stand for the proposition that a bank can never assert a property interest in the deposited funds against the depositor.

Following *Shaw*, another district in this circuit recently denied a motion to dismiss that raised a *Ciminelli* challenge to a bank fraud conspiracy change where the defendant allegedly "conspired to induce a bank to open an account, which was used to receive . . . customer deposits and from which the defendant and his co-conspirators 'regularly took money' from the bank's custody."  *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023).  The court found *Ciminelli* "inapposite" because the alleged scheme was one  "to obtain 'money or

property'" and not "to deprive a bank of 'valuable economic
information'" like in *Ciminelli*.  *Id.*  Similarly, the alleged
scheme in this case was to fraudulently induce banks to process
international transfers and receive "funds transferred from
[China]" in accounts from which the Ans "frequently" took money
"for their personal or business purposes."  (*See* Indictment
¶ 86.)

The Ans respond that the Government's theory is "nothing
but another way of phrasing the same right-to-control theory
that *Ciminelli* prohibits."  (Reply 1.)  They argue the
Government's theory "implicates nothing more than  bank's right-
to-control who gets to be an account holder."  (Mem. 17.)  The
Court respectfully disagrees.  *Ciminelli* did not reject the
premise that depriving a victim of information in order to
induce the victim to part with traditional property can be
fraud.  *Ciminelli* simply rejected the notion that *information
itself can be property*.  *See Ciminelli*, 598 U.S. at 316; *see
also Venkata*, 2024 WL 86287, at *10 (upholding conviction based
on similar facts to facts in *Ciminelli* where jury was not given
a right-to-control instruction).

The Court does not find the two pre-*Ciminelli* decisions the
Ans cite in their motion to dismiss, *United States v. Zarrab*,
No. 15-cr-867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016),
and *United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361

(S.D.N.Y. Dec. 6, 2019), which explicitly relied on right-to-control theories, to suggest that the Government is implicitly relying on a right-to-control theory in this case.  (*See* Mem. 14-15.)  Those cases concerned schemes to route money through victim banks while concealing that the true participants in the transactions were sanctioned countries and thereby exposing the victim banks to liability.  *See Zarrab*, 2016 WL 6820737, at *14; *Nejad*, 2019 WL 6702361, at *15.  In each case, the government framed the alleged harm as a deprivation of information necessary for the banks to make informed decisions about who to transact with.  *See Zarrab*, 2016 WL 6820737, at *11; *Nejad*, 2019 WL 6702361, at *14.  The fact that convictions relied on right-to-control theories in these two cases, however, does not exclude the possibility that a case with a similar fact pattern can involve both the informational harm previously prosecutable under a right-to-control theory *and* a further harm to a traditional property interest.  *See Ciminelli*, 598 U.S. at 317-18 (Alito, J., concurring) ("I do not understand the Court's opinion to address . . . the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property . . . ."); *Bankman-Fried*, 680 F. Supp. 3d at 304-05 (". . . *Ciminelli* is inapposite because the . . . Indictment alleges that the defendant conspired to induce a bank to open an account, which

26

was used to receive . . . customer deposits and from which the
defendant and his co-conspirators 'regularly took money' from
the bank's custody."). Before *Ciminelli*, there was simply no
need for a court to even address whether a deprivation of a more
traditional property interest occurred if the court had already
found that a defendant could be convicted under the right-to-
control theory.

The Court also does not find persuasive the Ans' argument
that the alleged scheme could not have "deprived" the victim
banks of any property interest because the scheme only resulted
in the Ans depositing their own money and "the banks presumably
profited from maintaining [the] accounts and processing the
transactions." (*See* Reply 4-7.) The presumed profit to the
bank from maintaining and protecting the funds in the customer
accounts is a property interest. *Shaw*, 580 U.S. at 66.
Further, a scheme to defraud requires "neither a showing of
ultimate financial loss nor a showing of intent to cause
financial loss." *Id.* at 67 (explaining that a victim is "'none
the less cheated out of his [or her] property, when he [or she]
is induced to part with it by fraud,' even if 'he [or she] gets
a quid pro quo of equal value'") (quoting *United States v. Rowe*,
56 F.2d 747, 749 (2d Cir. 1932)). Further, the Ans' argument
implicates the potential sufficiency of the government's trial
proof, not the sufficiency of the allegations in the Indictment,

which do not imply that the Ans "owned" all the relevant accounts or money.  (*See* Indictment ¶¶ 82-86.)

Moreover, even if it were established at trial that all the relevant funds and accounts belonged to the Ans, that would not necessarily require dismissal because the victim banks generally would have had ownership or at least possessory interests in the deposited funds and presumably would have profited from the accounts.  *Shaw*, 580 U.S. at 66; *see United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019) (upholding bank fraud conviction where defendant "caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with an unregistered Bitcoin exchange" and "did so with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' accounts"), *abrogated on other grounds by Ciminelli*, 598 U.S. 306.[3]  The precise nature of the contractual relationships between the conspirators and banks is another factual issue that must be resolved at trial.

Finally, the Court does not find *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018), supportive of the Ans' argument that they "cannot have deprived financial institutions

---

[3] In *Lebedev*, the government explicitly relied on a right-to-control theory to convict the defendant of *wire fraud* but relied on a traditional fraud theory to convict the defendant of *bank fraud*.  *See* 932 F.3d at 48-49.  The analysis from *Lebedev* cited herein is *Lebedev*'s bank fraud analysis.

of property by transferring their own money into and out of bank accounts." (*See* Reply 7.) Even if that decision bound this Court, it is materially distinguishable. In *Perez-Ceballos*, the government charged the defendant with bank fraud conspiracy and money laundering conspiracy on the theory that her fraudulent procurement of a brokerage account exposed a bank to a risk of loss because the deposited funds were proceeds of money laundering. 907 F.3d at 866. The jury convicted the defendant of bank fraud conspiracy but acquitted her of money laundering conspiracy. *Id.* The court of appeals reversed on several grounds, including that the jury's acquittal on the money laundering charge meant that the government failed to prove *as a matter of fact* that the victim bank faced any risk of loss in that particular case. *Id.* at 869 (concluding "jury's refusal to convict on money laundering" eliminated possibility that defendant's conduct caused risk of loss to bank and government "offer[ed] no other evidence that [victim bank] suffered any risk of loss from the defendant's merely opening the account and moving from it money within her legal control"); *see United States v. Scott*, No. 17-cr-630 (ER), 2023 WL 6064329, at *9 (S.D.N.Y. Sept. 14, 2023) (distinguishing *Perez-Ceballos*, explaining that "the critical deficiencies" in that case were government's "failures to adduce sufficient evidence of the false representations and risk of loss – not that the underlying

transactions involved Perez-Ceballos' own funds"). The court of appeals in *Perez-Ceballos* did not, as the Ans suggest, (*see* Reply 7), reverse on the ground that the transactions at issue involved the defendant's own money.

In sum, the Indictment sufficiently alleges a bank fraud scheme under the minimal standards required at this stage, and its allegations do not confine the Government to proceeding on an invalid legal theory at trial.

**B.  Factual Sufficiency of the Bank Fraud Theory**

The Ans next argue that regardless of *Ciminelli*, Count Eight must be dismissed because the Indictment fails to specify *how* their alleged misrepresentations could have harmed the victim banks. (Mem. 17–20.) Specifically, they note that the Indictment does not state what "risk of civil and criminal liability" the alleged misrepresentations caused the banks to incur, (Mem. 18 (quoting Indictment ¶ 84)), or what "applicable law" the banks attempted to comply with, (*Id.* (quoting Indictment ¶ 83)).

Notwithstanding (1) the actual or risked imposition of monetary penalties on banks that fail to comply with regulatory or statutory requirements with respect to obtaining and maintaining accurate customer information, (2) the risk of seizure or forfeiture by government enforcement efforts against the funds of bank customers who violate the law and the

30

resulting loss of the banks' property interests in using the funds to make loans and profits, and (3) the payment of interest by banks to account holders, the Indictment need not provide such granular factual detail.  As explained above, (*supra* 19–20), the Indictment tracks the language of the charging statute and provides enough detail about the date and time of the alleged offense to enable the Ans to lodge a double jeopardy challenge against a future prosecution based on the same alleged fraud, which is all the detail the Government must provide at this stage, *see Aquart*, 92 F.4th at 89; *Bout*, 731 F.3d at 240–41.  Because the Government has not made a full pre-trial proffer of the evidence it intends to introduce at trial, (*see* ECF No. 158, Gov't's Mem. Opp'n Pretrial Mots. of Guangyang An & Quanzhong An ("Opp'n"), 24), and the Court cannot compel it to do so, *Wedd*, 993 F.3d at 121, the Ans' challenge to the sufficiency of the Indictment and the Government's evidence cannot succeed.  To the extent any factual gaps raise constitutional concerns with respect to the Ans' ability to prepare a defense, those concerns can be addressed through additional pre-trial disclosures if necessary,  *see Sampson*, 898 F.3d at 280, but they do not bring the allegations in the Indictment below the very low bar for what constitutes factual sufficiency in a federal criminal case.

As to the Ans' argument that the Government's bank fraud

theory is "unprecedented," (Mem. 20), "novel legal theories are not invalid by default," *CFPB v. TransUnion*, 674 F. Supp. 3d 467, 471 (N.D. Ill. 2023). At any rate, the Government's theory at least resembles the theories advanced in indictments found to be sufficient in the sanctions cases the Ans cite in their brief. (*See* Mem. 19 (citing *Zarrab*, 2016 WL 6820737, at *14 (finding indictment stated bank fraud scheme by alleging defendant conspired to mislead banks into processing transactions involving sanctioned countries); *Nejad*, 2019 WL 6702361, at *15 (similar))). The cryptocurrency cases the Government cites in its brief are also at least somewhat analogous in that they involved bank fraud charges based on the defendants' fraudulent inducement of banks to open accounts and process deposit and withdrawal transactions the banks would not have processed but for the defendants' misrepresentations. (*See* Opp'n 20-21 (citing *Bankman-Fried*, 680 F. Supp. 3d at 304-05 (". . . [T]he indictment plainly alleges a scheme to obtain 'money or property,' not a scheme to deprive a bank of 'valuable economic information.'"); *Lebedev*, 932 F.3d at 49).) And to the extent the Government's argument is novel, that alone does not invalidate the charges.

Finally, the Ans stress the consequences of allowing the Government to proceed on the bank fraud theory as alleged in the Indictment, arguing that it would make the federal bank fraud

32

statute cover "anyone who transferred funds in a manner inconsistent with any type of civil or criminal law, worldwide." (Mem. 20.)  The Court respectfully disagrees.  In any case brought under 18 U.S.C. § 1344(1), the government must prove that the defendant knowingly executed a scheme involving material misrepresentations or omissions with the specific intent to deceive a bank and that the scheme involved depriving the bank of something of value.  *Weigand*, 482 F. Supp. 3d at 234–35.  The Government's theory does change the nature of the proof it must offer to establish any other element of the offense.  The Court thus concludes that the Indictment is factually sufficient under Rule 7(c)(1).

### C.   Legal Sufficiency of the Money Laundering Charge

The Ans' final asserted ground for dismissing Count Eight implicates not the Government's bank fraud theory but rather its overall money laundering theory.  The Government charged the Ans under the provision of the federal money laundering statute criminalizing transferring funds internationally "with the intent to promote the carrying on of specified unlawful activity," the specified unlawful activity in this case being bank fraud.  (*See* Indictment ¶ 104); 18 U.S.C. § 1956(a)(2)(A). Because the specified unlawful activity is alleged to have been committed through international transactions of funds, (*see* Indictment ¶¶ 82–84), the Ans argue that the Indictment alleges

33

a "circular theory of money laundering" in which the Ans
transferred funds internationally with the intent to promote
those very transactions, which they insist is "logically
impossible," (Mem. 20).  The Government responds that some of
the transactions involved in the money laundering scheme
*comprised* the bank fraud (*e.g.*, transactions with false OBI
messages, which deceived the banks as to the ownership and
control of the funds) while others *promoted* the bank fraud
(*e.g.*, layering transactions involving personal and corporate
accounts controlled by the conspirators), and which transactions
fall in which category is a factual issue that cannot be
resolved until trial.  (Opp'n 24-25.)  The Court agrees with the
Government that the Ans' argument implicates the nature of the
Government's trial proof and not the sufficiency of the
Indictment.[4]  It is logically possible that some of the alleged
transactions comprised fraud and others promoted that fraud.
Accordingly, the Court will not dismiss Count Eight.

## II.  Motion to Sever Count Eight

Alternatively to their motion to dismiss, the Ans move to
try Count Eight separately from the trial on the Operation Fox

---

[4] The Court recognizes the need for the Ans to understand which transactions
the Government alleges *constituted* bank fraud and which transactions the
Government alleges *promoted* bank fraud in order to prepare an adequate
defense.  At oral argument, the Government agreed to provide clarifying
information on this topic to the Ans in advance of the trial.  (*See* Apr. 26,
2024, Oral Argument Tr. 82:22-83:21.)

Hunt charges.  (Mem. 22-25.)  Rule 8(a) permits the government to join offenses that (1) are of the same or similar character, (2) are based on the same act or transaction, or (3) are connected with or constitute parts of a common scheme or plan. Fed. R. Crim. P. 8(a).  Even if offenses are properly joined, however, the court may order separate trials under Rule 14(a) if a joint trial would substantially and unduly prejudice the defendant.  *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004); *see* Fed. R. Crim. P. 14(a).

The Government does not argue that either of the first two grounds for joinder under Rule 8(a) are satisfied, (Opp'n 28-31), and the Court finds based on the current record that they are not satisfied.  The alleged repatriation and money laundering schemes by the Ans are not similar in character because the elements of money laundering significantly differ from the elements of the other counts charged in the Indictment and the two schemes are not alleged to have involved the same general acts, transactions, or methods.  *See United States v. Tubol*, 191 F.3d 88, 94-95 (2d Cir. 1999) (reversing and remanding for new trial due to prejudicial joinder, concluding charges for appliance store robbery and bank robbery were not of the same or similar character due to material differences in methods and victims).  The alleged schemes also do not arise out of the same act or transaction because the factual allegations

supporting Count Eight have virtually no overlap with the allegations supporting Counts One through Seven.  *See United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978) (reversing and remanding for new trial due to prejudicial joinder, concluding that charges for Medicaid fraud and tax fraud did not arise out of the same act or transaction because government could not prove proceeds of Medicaid fraud were same sums that defendant failed to report to IRS).

Further, as to the third prong of Rule 8(a), the Court disagrees with the Government, (*see* Opp'n 28–31), that the two alleged conspiracies are connected with or constitute part of a "common scheme or plan."  Throughout this case, the Government has never taken the position that the Ans' alleged money laundering was done in service of the scheme to repatriate Doe. To the contrary, the Indictment charges the Ans with transferring funds into the United States to promote a *bank fraud* offense, not to promote any of the offenses related to John Doe that are charged in Counts One through Seven.  (*See* Indictment ¶¶ 103–04.)  Moreover, the Indictment alleges the Ans used the money for "personal or business purposes," "personal credit card debt," and "mortgages on [their] residences."  (*See* Indictment ¶¶ 82–86.)  It does not allege that the Ans used the proceeds of the money laundering scheme to fund the repatriation scheme except insofar as paying the mortgage on Mr. An's hotel

36

where some of his meetings and phone calls with Doe's son occurred.  (*See* Indictment ¶¶ 82-86, 103-04.)  The Government does not argue otherwise in its opposition.  (Opp'n 28-31.)  In fact, the Government conceded at oral argument that there was "no evidence that any of the money that was transferred and deposited into the Ans' accounts was used to finance parts of Operation Fox Hunt."  (Apr. 26, 2024, Oral Argument Tr. 20:14-20.)  It further clarified that "the money" from the alleged money laundering scheme "is unrelated to the rest of the allegations" except to the extent that it "paid mortgages on the hotel . . . where a Fox Hunt meeting occurred."  (*Id.* 23:18-22.)  Thus, the offenses in Counts One through Seven are not connected with or part of a common scheme or plan.

The Government's post-argument letter does not retreat from those concessions.  The letter focuses on overlapping evidence and discusses the role of Mr. An's hotel in the repatriation scheme, noting that Ms. An had "responsibility for the Hotel's finances," that Yuan and Doe's nephew "stayed at the Hotel in September 2018," and that Ms. An bought plane tickets for Doe's nephew and Yuan using a credit card "tied to" the same "entity" that owned the hotel.  (ECF No. 169, Apr. 30, 2024, Ltr. from A. Rangel.)  None of these evidentiary details about how the hotel may have featured in the repatriation scheme, however, add any strength to the connection between the hotel and the *money*

37

*laundering* scheme, which remains limited to *some* of the "laundered funds being used to pay the Hotel's mortgage." (*See id.*)  The only new information the Government offers that is relevant to the money laundering scheme is that the same bank account belonging to the "entity" that owned the hotel helped "facilitate" the money laundering scheme in some unspecified way. (*See id.*)  Although the phrasing in the Government's letter is highly ambiguous, the Government arguably raises the possibility that Ms. An used proceeds from the money laundering scheme to purchase plane tickets for Yuan and Doe's nephew in service of the repatriation scheme.  The Government's concessions at oral argument, however, closed the door to that possibility. (*See* Apr. 26, 2024, Oral Argument Tr. 20:14-20, 23:18-22.)

Thus, instead of arguing that the money laundering scheme was in service of the repatriation scheme, the Government advances the theory that *both* schemes were part of a broader plan by the Ans to use "various methods" to "obtain power and influence" in the United States and China. (Opp'n 28.)  That theory is far too thin a thread to tie these alleged schemes together.  The Government cites no legal authority in support of its argument that Count Eight was properly joined under Rule 8(a), let alone a case where a court permitted joinder under a similarly broad frame of reference. (*See id.* 28-29.)

Offenses based on transactions that constitute a common scheme or plan or that are of the same or similar character may warrant joinder to promote judicial efficiency. But if the "common scheme or plan" or "same or similar character" is framed too broadly, then "everything may be connected," which defeats the purpose of having any rules about joinder in the first place. *United States v. Turoff*, 853 F.2d 1037, 1039 (2d Cir. 1988) (acknowledging this dilemma); *see also United States v. Oaks*, 285 F. Supp. 3d 876, 880 (D. Md. 2018) (finding charges improperly joined where government's "alleged scheme [was] so broad that *any* act of corruption at *any* point during [defendant's] public service could be properly joined"). The Second Circuit has reversed convictions where the government relied on joinder theories involving such overbroad common schemes or plans. *See United States v. Shellef*, 507 F.3d 82, 99–100 (2d Cir. 2007) (reversing and remanding for new trial, rejecting government's argument that tax charges and non-tax charges were properly joined on ground that they all concerned the sale of a regulated chemical where funds generated by alleged scheme were unrelated to the unreported income that supported the tax charges and the tax violations occurred before the other scheme began); *United States v. Litwok*, 678 F.3d 208, 217 (2d Cir. 2012) (similar); *Halper*, 590 F.2d at 432 (rejecting government's argument that Medicaid fraud and tax fraud charges

39

were properly joined on ground that "totality of [defendant's] deceitful practices evidenced his intent to enrich himself by submitting false documents to [g]overnment agencies").

Here, the Government's frame of reference for joinder similarly "paints the allegations with too broad a brush." *See Shellef*, 507 F.3d at 99.  Virtually any additional charge against the Ans could fall under the umbrella of their alleged plan to "obtain power and influence in both the United States and [China]," (*see* Opp'n 28), even if the offenses charged had completely distinct natures, legal elements, and supporting facts.  Moreover, the Government's theory is so broad that it joins together schemes with immediate goals that are at odds with each other.  The alleged repatriation scheme involved the Ans *cooperating* with Chinese government officials, but the alleged money laundering scheme involved the Ans *violating* the Chinese government's regulations purely to enrich themselves. (*See* Reply 13.)

The Court thus concludes that there was no basis under Rule 8(a) to join Count Eight with the other counts in the Indictment and grants the Ans' motion to try Count Eight separately.  Accordingly, the Court need not address whether the joinder also would be unduly prejudicial under Rule 14(a).  *See United States v. Dervishaj*, No. 13-cr-668 (ENV), 2015 WL 13842839, at *4 n.8 (E.D.N.Y. June 11, 2015).

## III. Motion to Suppress

Ms. An moves to suppress any evidence obtained from the searches authorized by the Apple warrant and residence warrants. (Mem. 26–42; Suppl. Mem. 5–13.)  A defendant may move before trial to suppress unlawfully obtained evidence, including evidence obtained in violation of the Fourth Amendment to the federal Constitution.  Fed. R. Crim. P. 12(b)(3)(C); *United States v. Franco*, No. 22-cr-43 (VAB), 2023 WL 1502671, at *5 (D. Conn. Feb. 3, 2023).

The Fourth Amendment requires that any warrant be supported with "probable cause, . . . particularly describing the place to be searched" and "persons or things to be seized."  U.S. Const. amend. IV.  Probable cause exists when the totality of the circumstances indicate that it is reasonably likely that evidence of a crime will be found in a given place.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Bodnar*, 37 F.4th 833, 841 (2d Cir. 2022).  A "particular" description is one that identifies the offense for which the police established probable cause, describes the place to be searched, and identifies the items to be seized by their relation to the subject offense.  *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020).  Additionally, a sufficiently particular warrant may nonetheless be overbroad if it authorizes seizing items that the government did not establish probable cause to seize.  *Id.*

at 179.

A search or seizure executed in accordance with a warrant is presumptively valid. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). The defendant may rebut that presumption, however, by showing that the government's affidavit in support of the warrant intentionally or recklessly misstated or omitted information material to the issuing judge's probable cause finding. *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). The Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978), instructed that the court should hold an evidentiary hearing if the defendant makes a "substantial preliminary showing" that such misconduct occurred, *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023).

The Fourth Amendment also requires that searches and seizures be carried out in a reasonable manner. U.S. Const. amend. IV. A search is unreasonable if it exceeds the terms of the warrant that authorized it. *Simon v. City of New York*, 893 F.3d 83, 93 (2d Cir. 2018). Some district courts in this circuit have contemplated that a search of seized digital information may be unreasonable if the government unduly delays its review of the seized material. *United States v. Olivo*, No. 22-cr-582 (VEC), 2023 WL 8432864, at *2 (S.D.N.Y. Dec. 5, 2023). There is "no established upper limit" for the timing of that review, however. *United States v. Daskal*, 676 F. Supp. 3d

153, 178 (E.D.N.Y. 2023); *see also* Fed. R. Crim. P. 41(e)(2)(B) advisory committee's note to 2009 amendment (noting digital search warrant must specify time period for onsite seizure but rejecting "'one size fits all' presumptive period" for subsequent offsite review).

A Fourth Amendment violation does not necessarily require suppression.  If a facially valid warrant is later determined not to have been supported by probable cause, the court will not suppress evidence the police lawfully seized while relying in good faith on that warrant.  *Herring v. United States*, 555 U.S. 135, 142 (2009); *United States v. Lauria*, 70 F.4th 106, 121 (2d Cir. 2023).

Here, in support of suppressing the evidence the Government obtained from the Apple and residence warrants, Ms. An argues that the Government obtained the warrants through reckless material misrepresentation, (Suppl. Mem. 6-13), that the warrants were facially invalid, (Mem. 27-33), that the Government exceeded the warrants' parameters in executing the warrants, (*id.* 33-36), and that the Government unreasonably delayed its review of the seized material, (*id.* 36-42). Alternatively to suppression, Ms. An seeks a *Franks* hearing to establish that the Government obtained the warrants through material misrepresentation.  (Suppl. Mem. 15.)

### A.    The Warrant Applications

The Court respectfully concludes that Ms. An has not made a substantial preliminary showing that Agent Moritz intentionally or recklessly made material misrepresentations or omissions to the magistrate judges to obtain the Apple warrant or the warrant authorizing the search of her residence.

#### 1.    "Provided"

The first challenged statement is that Ms. An "provided" Yuan and Doe's nephew with Doe's son's contact information and photograph "to identify" him.  (Suppl. Mem. 6–7; *see* Apple Aff. ¶ 43.)  Ms. An argues that this statement was contradicted by the September 2018 conversation between the son and nephew in the Queens restaurant, where the nephew said they "had [the son's] photo to ID" and "then came [to Queens] to search for [his] WeChat" and also that the number they had was "from China."  (Suppl. Mem. 7; *see* ECF No. 156-3, 11, 13.)  Ms. An also cites WeChat logs between herself and Yuan where Yuan sent her a photograph of a piece of paper containing a picture of the son's house with the address written above in English and Chinese.  (Suppl. Mem. 7 n.5; *see* ECF No. 156-4, 2.)

Ms. An has not made a substantial preliminary showing that Agent Moritz's statement that she "provided" Yuan and the nephew the son's information was a reckless material misrepresentation. In the same September 2018 conversation upon which she relies,

44

Doe's nephew responded to Doe's son's question asking how Doe's nephew got his number by explaining that "Yuan contacted the daughter of An QuanZhong" and that "she is the one who led [them]." (ECF No. 156-3, 11.)  Later in the conversation, the nephew reiterated that "An, GuangYang . . . offered [the son's] phone number." (*Id.* 14.)  In full context, Agent Moritz's conclusion that Ms. An provided Yuan and the nephew with the son's contact information was a reasonable interpretation of the transcript that provides probable cause rather than a reckless misrepresentation.  *See Soto v. City of New York*, 132 F. Supp. 3d 424, 447 (E.D.N.Y. 2015) (finding "discrepancy" in intercepted text message conversation did not "negate probable cause" under "totality of the facts"); *United States v. Jones*, No. 00-cr-182 (JGK), 2000 WL 1448640, at *7 (S.D.N.Y. Sept. 28, 2000) (denying *Franks* hearing where "although the recorded conversations . . . may have had an innocent meaning, [agent's] interpretations of the recorded conversations were reasonable and [magistrate judge] could rely on them in finding probable cause").  Further, Ms. An cites no authority for her assertion that Agent Moritz was required to qualify his statement by writing that he was only drawing an inference based on his reading of the transcript, (*see* Reply 20), and the Court concludes he was not so required, *see United States v. Bailey*, No. 15-cr-6082 (MWP), 2016 WL 6995067, at *19 (W.D.N.Y. Nov. 29,

45

2016) (collecting cases holding that an officer may summarize a recorded call in his or her own words when applying for a search warrant).  Even if the Court were to find that Agent Moritz should have acknowledged that the conversation in the transcript could be interpreted differently, the Court would find the omission of more equivocal language to be mere negligence, not an intentional or reckless misstatement.

### 2.   "Directed"

The next challenged statement is the statement in paragraph 19 of the affidavit that "members of the [Chinese] government directed" Ms. An "to engage in unsanctioned and illegal conduct in the United States" on China's behalf "for the purpose of coercing [Doe] to return" to China.  (Suppl. Mem. 8; *see* Apple Warrant ¶ 19.)  Ms. An argues that the Government's proffered evidence supporting that statement all derives *from* the search executed pursuant to the Apple warrant and that the Government thus logically could not have had any such evidence at the time Agent Moritz applied for the warrant that authorized the Apple search.  (Suppl. Mem. 8; *see* ECF No. 145, Feb. 27, 2024, Ltr. from A. Rangel ("Feb. 27, 2024, Proffer").)

Ms. An has not made a substantial preliminary showing that Agent Moritz's statement that she was "directed" to help coerce Doe's return to China was reckless or material to Magistrate Judge Henry's probable cause finding.  First, the statement

46

itself is not worded particularly strongly.  It does not say
that Chinese government officials "directed Ms. An" to assist in
Doe's repatriation but rather that they "directed several
individuals, including but not limited to the users of the
Subject Accounts" to do so.  (Apple Aff. ¶ 19.)  Second, as
explained below, Agent Moritz relied on the ample circumstantial
evidence that followed paragraph 19 of his affidavit to
reasonably believe that the statement was true.  Excising
paragraph 19 from Agent Moritz's affidavit would have left more
than enough evidence to find probable cause.

    The Court cannot consider the circumstantial evidence
against Ms. An in a vacuum.  It must consider probable cause
against the backdrop of other information Agent Moritz provided,
which suggested both that (1) Ms. An's father was cooperating
with Chinese officials regarding Doe's repatriation and
(2) Ms. An transported and accompanied a Chinese official to
Doe's son's residence as part of the official's "special trip"
to convince Doe's son to coerce Doe to return to China.  For
example, Agent Moritz included details from recorded
conversations between Mr. An and Doe's son discussing in
explicit and granular detail Mr. An's discussions with specific
Chinese officials about Doe's repatriation.  (*See* Apple Aff.
¶¶ 52-73.)  In one of those conversations, Mr. An told Doe's son
"that the [Chinese] government had identified [Mr. An] 'to be

the one to make [the repatriation] happen.'" (*Id.* ¶ 72.)  Agent
Moritz also included details about Ms. An's September 2018 visit
to Doe's son's residence with Yuan and Doe's nephew, who had
travelled to New York under suspicious circumstances.  Yuan and
Doe's nephew were initially denied visas by the United States
and subsequently obtained them only after applying again to
travel as part of a "tourist group" with their wives. (*Id.*
¶¶ 31-32.)  Once in the United States, they left the group to go
to New York, where Ms. An drove them to Doe's son's house. (*Id.*
¶ 33.)  When Yuan and the nephew met with Doe's son, Yuan
pressured the son to convince Doe to return to China. (*Id.*
¶¶ 45-46.)

Given the context of Mr. An's involvement in the
repatriation scheme and Yuan's September 2018 visit to New York
to pressure Doe's son to encourage his father to return to
China, the Apple affidavit's allegations regarding Ms. An
support a reasonable belief that she was involved in the scheme.
The affidavit details how Ms. An drove Yuan to Doe's son's home
and includes still shots of surveillance footage of her and Yuan
at Doe's son's home looking intently at their phones. (*Id.* ¶¶
34-36.)  Yuan taped a note to the son's door directing him to
call Ms. An. (*Id.* ¶ 37.)  The same day, Ms. An's phone called
Doe's son's phone multiple times. (*Id.* ¶ 38.)  Even if this
evidence might not persuade a jury beyond a reasonable doubt

48

that Ms. An actively participated in the repatriation scheme, it was sufficient for an officer to believe that Ms. An was aware of the reason Yuan was in the United States, agreed to drive him to at Doe's son's house, and assisted him in locating and travelling to the house. *See United States v. Moffitt*, No. 22-cr-67 (CCR), 2023 WL 4197110, at *7 (D. Vt. June 27, 2023) ("The court's probable cause inquiry 'turns on an assessment of probabilities and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence.'") (quoting *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005)).

### 3.  The Surveillance Footage

Ms. An also argues that Agent Moritz described the video footage of her at Doe's son's house in a misleading way and that the misleading description supports a conclusion that he acted with reckless disregard for the truth.  (Suppl. Mem. 10.)  The Court respectfully disagrees.  Agent Moritz's description simply did not "suggest[] that Ms. An was attempting to break into the house."  (*See id.*)  The Court has reviewed the footage, (*see* ECF Nos. 156-6, 156-7, 156-8), and finds that Agent Moritz's description accurately described what the video showed.  Ms. An appears in the video with Yuan at Doe's son's residence attempting to open doors, looking into windows, opening the mailbox removing mail and placing it back in the mailbox, and

taking pictures of the house.  (*See* Apple Aff. ¶ 35.)  Given that Agent Moritz was in possession of recorded conversations of Yuan and Mr. An pressuring Doe's son to convince Doe to return to China, it was reasonable for him to infer based on the video showing Ms. An's unusually intrusive behavior during the visit to Doe's son's home was also part of the effort to pressure Doe's son to convince his father to return to China and that Ms. An was not oblivious to that purpose.

Because Ms. An has not met her burden to make a substantial preliminary showing that Agent Moritz made any intentional or reckless material misrepresentations to Magistrate Judge Henry, she is not entitled to suppression or a *Franks* hearing with respect to the Apple warrant.  Further, because her arguments for suppression or a *Franks* hearing with respect to the residence warrant hinge on a finding that there *was* impropriety in the Apple warrant application, (*see* Suppl. Mem. 12–13), Ms. An also is not entitled to suppression or a *Franks* hearing with respect to the residence warrant.

### B.    The Warrants

Having addressed Ms. An's challenge to the warrant applications, the Court next turns to her challenge to the warrants' facial validity.

#### 1.    The Apple Warrant

Ms. An challenges the Apple warrant as overbroad.  (Mem.

27-30.)[5]  First, she argues it was overbroad in authorizing
seizure of "[i]nformation relating to any benefit" conferred on
any alleged co-conspirators when the evidence did not establish
probable cause to believe she might have been given one.  (*Id.*
28-29.)  Second, she argues it was overbroad with respect to its
five-year date range given that her alleged misconduct was
limited to a short period in 2018.  (*Id.* 29.)

The Court does not find subcategory (i) of the Apple
warrant, which authorized the Government to search for
"[i]nformation relating to any benefit, financial or otherwise,
conferred to" the Ans or their alleged co-conspirators "for
committing the Subject Offenses," overbroad.  (*See* Mem. 28-29;
Apple Warrant 6.)  Given the evidence presented to Magistrate
Judge Henry, there was probable cause to believe that the Ans
would have expected *something* – whether money or a more
intangible benefit such as gaining favor with the Chinese
government – in exchange for their assistance with the scheme to
repatriate Doe.  *See United States v. Wells*, No. 13-cr-8 (JDR),

---

[5] Ms. An had also argued the Apple warrant was insufficiently particular
because its authorization for agents to seize materials "relating to
knowledge of violating the laws of the United States" defeated the purpose of
limiting the warrant to its subject offenses.  (Mem. 28; *see* Apple Warrant
5.)  At oral argument, however, the parties agreed that the Court would not
have to resolve this issue assuming the Government would not rely on any
evidence obtained exclusively pursuant to that clause, which the Government
indicated it would not attempt to do.  (*See* Apr. 26, 2024, Oral Argument Tr.
58:24-59:7.)  Accordingly, the Court addresses only Ms. An's overbreadth
challenge to the Apple warrant's facial validity and not her particularity
challenge.

2014 WL 12795575, at *14–15 (D. Alaska Jan. 16, 2014) (rejecting
argument that warrants were "overbroad because there was no
financial motive"); *United States v. Comite*, No. 06-cr-70 (MMB),
2006 WL 3360282, at *16 (E.D. Pa. Nov. 17, 2006) (rejecting
overbreadth challenge where evidence to be searched "may [have
been] probative as to [d]efendant's intent or motive before a
jury, even if there [was] no specific charge" relating to
evidence sought).  There was also probable cause to believe that
evidence of such a benefit would be on Ms. An's phone, which she
had already used in connection with the alleged repatriation
scheme.  (*See* Apple Aff. ¶¶ 36–39.)

Ms. An also challenges as overbroad the Apple warrant's
five-year date range, noting that Agent Moritz's only mention of
her was limited to a short period in 2018.  (Mem. 29.)  There is
"no clearly established law" in the Second Circuit regarding
"when and to what degree time limitations are required." *United
States v. Disla Ramos*, No. 22-cr-431 (LJL), 2022 WL 17830637, at
*11 (S.D.N.Y. Dec. 21, 2022).  A "warrant will ordinarily be
upheld where at least some temporal limitation is specified."
*United States v. Yu*, No. 22-cr-208 (CBA), 2023 WL 4687970, at
*12 (E.D.N.Y. July 21, 2023).  Given the ongoing "complex
circumstances of the underlying crimes" in this case, *see
Galgano v. Putnam County*, No. 16-cv-3572 (KMK), 2024 WL 1623401,
at *88 (S.D.N.Y. Apr. 15, 2024), the warrant's five-year range

52

was reasonable.  The affidavit detailed conduct by Mr. An in the scheme to repatriate Doe that extended from 2018 to the time the Government applied for the Apple warrant.  (*See* Apple Aff. ¶¶ 47-73.)  It was reasonable for Magistrate Judge Henry to infer that "relevant evidence" concerning Mr. An's daughter could "still be found" even after her alleged participation (that the Government knew about) had "been completed."  *See Yu*, 2023 WL 4687970, at *12.  Thus, the Court concludes that the Apple warrant was not overbroad.

Even if the Apple warrant were overbroad, however, suppression would be improper because law enforcement presented its evidence to a neutral magistrate before searching Ms. An's Apple account, and Magistrate Judge Henry's probable cause finding rendered the search presumptively valid.  *See United States v. Ray*, 541 F. Supp. 3d 355, 397 (S.D.N.Y. 2021).  The presumption has not been overcome in this case because the warrant was not so lacking in probable cause or so facially deficient that a reasonable officer should have been on notice that undertaking a search pursuant to the warrant was unlawful. *See id.*  Accordingly, Ms. An is not entitled to suppression of evidence seized pursuant to the Apple warrant based on the Apple warrant's facial validity.

### 2.   The Residence Warrant

Next, Ms. An challenges the facial validity of the warrant

authorizing the search of her residence, arguing that it was overbroad and improperly relied on stale evidence.  (Mem. 30–33.)  In her overbreadth challenge, Ms. An contends that the warrant improperly authorized seizure of "all" electronic devices and digital media present in her residence even though Agent Moritz discussed only one phone she used in 2018.  (Mem. 31–32; *see* Residence Warrants 1; Residence Aff. ¶ 10.)  Law enforcement seized three iPhones, two laptops, and a SIM card from Ms. An's residence, although the Government now agrees to "confine its use of electronic devices seized from" the residence to the phones.  (Opp'n 43.)

Neither the challenged clause nor the Government's agreement not to use evidence obtained from the laptops or SIM card render the warrant overbroad.  A "warrant does not become overbroad for having the phrase 'any [or all] electronic devices.'"  *Yu*, 2023 WL 4687970, at *11.  Rather, a warrant becomes overbroad if it authorizes seizure of items "wholly unrelated" to the subject offenses or fails to provide "any guidance" as to what digital information should be seized.  *Id.* (quoting *United States v. Romain*, 678 F. App'x 23, 26 (2d Cir. 2017)).  Agent Moritz "did not need to establish probable cause that there would be electronic devices" in Ms. An's residence "for the warrant to authorize [seizure of] electronic devices if they were found there."  *See Ray*, 541 F. Supp. 3d at 405.  Agent

54

Moritz attested that "[Chinese] government officials communicate
with assets abroad . . . through encrypted chat platforms,"
identified evidence that Ms. An herself used an electronic
device in the commission of one of the subject offenses, and
swore based on his training and experience that computer files
can be recovered years after they have been downloaded.  (*See*
Residence Aff. ¶¶ 10-12, 22; Indictment ¶ 27.)  He was "required
to do no more."  *See Ray*, 541 F. Supp. 3d at 406.  Moreover,
because officers lacked specific information that could identify
the precise phone Ms. An used during the events they knew about,
the warrant authorized and the officers were thus "justified in
seizing all cellphones" to ensure they had the phone containing
evidence related to the investigation.  *See Disla Ramos*, 2022 WL
17830637, at *16.

Ms. An's staleness challenge argues that it was
unreasonable to believe relevant evidence might still have been
in her residence in 2022 when her only alleged involvement in
the scheme was limited to a short period in 2018.  (Mem. 32-33.)
The Indictment attached to Agent Moritz's affidavit detailed
conduct by Mr. An in the scheme to repatriate Doe that extended
from 2018 to the time the Government applied for the Apple
warrant and explained how Ms. An allegedly fit into the scheme.
(*See* Indictment ¶¶ 40-77.)  It was reasonable for Magistrate
Judge Levy to find that relevant evidence would still be in

Ms. An's residence.  *See Yu*, 2023 WL 4687970, at *12.
Accordingly, the Court concludes that the residence warrant was
facially valid and further concludes for the reasons stated
above, (*see supra* 53), that exclusion would be an improper
remedy for any overbreadth because the officers relied on the
warrant in good faith.

### C.    The Searches

Having found no impropriety in the warrant application
processes and no facial defects in the warrants themselves, the
Court addresses Ms. An's challenge to how the Government
conducted its searches pursuant to those warrants.

#### 1.    Overseizure

Ms. An first requests blanket suppression of the seized
material, arguing that the Government exceeded the warrants'
parameters by seizing irrelevant personal material and by
seizing material that fell outside the warrant's authorized
categories and date ranges.  (Mem. 33–36.)  The ordinary remedy
for a search that exceeds a warrant's scope is suppression and
return of the items improperly seized.  *In re 650 Fifth Ave. &
Related Props*, 830 F.3d 66, 101 n.32 (2d Cir. 2016).  The
extreme remedy of blanket suppression is available only when the
police, acting in bad faith, exceed a warrant's scope so
egregiously that the search essentially amounts to a forbidden
"general search."  *United States v. Liu*, 239 F.3d 138, 140

(2d Cir. 2000).

Neither of the seizures pursuant to the warrants that Ms. An challenges exceeded the scope of the warrants' categories or temporal parameters.  Moreover, the warrants did not impose any restrictions on the Government's search protocols.  (*See* Apple Warrant 4-6; Residence Warrants 5-6); *United States v. Lumiere*, No. 16-cr-483 (JSR), 2016 WL 7188149, at *5 (S.D.N.Y. Nov. 29, 2016) (rejecting Fourth Amendment overseizure challenge where "[t]he warrant . . . did not, by its own terms, require the Government to use a search protocol or segregate documents").  The Court also does not find that law enforcement's conduct here resembled a general search or egregiously exceeded the warrants' scope.  District courts in this circuit have "rejected . . . attempt[s] to constitutionalize document review procedures" in the context of digital searches.  *See Lumiere*, 2016 WL 7188149, at *5 (rejecting overseizure claim that government's lack of review protocols "left his non-responsive personal data readily accessible to any member of the investigating team").  It would have been impracticable for the Government to have not marked chat or text threads responsive when non-responsive material was interspersed throughout the thread, *see United States v. Ganias*, 824 F.3d 199, 213 (2d Cir. 2016) (en banc) (noting that such "interspersion . . . may affect the degree to which it is

57

feasible, in a case involving a search pursuant to a warrant, to fully extract and segregate responsive data from non-responsive data"), and the Court will hold the Government to its word at oral argument that it will not attempt to introduce non-responsive matter at trial, (*see* Apr. 26, 2024, Oral Argument Tr. 57:7–8). Moreover, even if the Court had found that law enforcement conducted a general search, it would not order blanket suppression because the circumstances do not evince bad faith. *See United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 62 (D. Conn. 2002).

Finally, to the extent the Government reviewed documents protected by the marital communications privilege, (*see* Mem. 34), the Court may exclude such evidence on motions *in limine*; however, those determinations would be premature at this stage.

### 2. Delay

Ms. An next seeks blanket suppression based on what she argues was undue delay by the Government in reviewing the seized digital material. (Mem. 39–42.) Nothing in either of the warrants, which the Court already found facially valid, required review within any specific timeframe. (*See* Apple Warrant 4–6; Residence Warrants 2–3); *Lumiere*, 2016 WL 7188149, at *7 (denying blanket suppression where government's review process did not violate warrant's own requirements).

Furthermore, the Court does not find applicable *United*

*States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), which concerned an extreme circumstance where the court granted blanket suppression based on the government's unexplained fifteen-month delay in commencing review of seized digital material and its repeated violation of court orders to review and produce that material.  Most importantly, unlike in *Metter*, which concerned an undue delay in *commencing* review, the Government here commenced its review the day the material became available.  (*See* Execution Ltr. 3-4); *see Lumiere*, 2016 WL 7188149, at *3 (finding *Metter* inapplicable to seized devices where "there was no delay in reviewing them at all").  The Government began making productions within a month of the Ans' indictment, (ECF No. 43), and continued doing so over the next few months, (ECF Nos. 55-56, 63, 66-68, 77-78, 82, 87, 103), which militates against a finding of bad faith.

Additionally, the review process was slowed by the need for translation, as many of the seized communications were in Chinese.  (*See* Execution Ltr. 3-4.)  Finally, the execution of a responsiveness review further distinguishes this case from *Metter*, where the Government conducted no such review.  *See United States v. Daskal*, 676 F. Supp. 3d 153, 177 (E.D.N.Y. 2023) (distinguishing *Metter* on that ground).

In this case, the Government's roughly two-year delay in *completing* the review was "certainly not brief" but also "not

59

unreasonably long considering the challenges of searching ESI from electronic devices" and the necessity of translation in this case.  *See id.* at 178.  Thus, the timing of the Government's review does not support the drastic remedy of blanket suppression.

## IV.  Motion to Disclose Grand Jury Minutes

Finally, Ms. An moves to disclose the grand jury minutes based on Agent Moritz's statements in the warrant applications that Ms. An contends were reckless and material misrepresentations.  (Suppl. Mem. 13–14.)  Grand jury minutes are presumptively secret.  Fed. R. Crim. P. 6(e)(2)(B).  To overcome the presumption of secrecy, the defendant must show a "particularized need" outweighing the public interest in maintaining grand jury secrecy.  *United States v. Silver*, 103 F. Supp. 3d 370, 381 (S.D.N.Y. 2015) (quoting *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)).  Ms. An invokes an exception to this presumption, relying on the speculative possibility that events that occurred during the grand jury proceeding may support dismissing the indictment.  (Suppl. Mem. 13); *see* Fed. R. Crim. P. 6(e)(3)(E)(ii).  Specifically, she argues that the minutes are "necessary . . . to ascertain whether the misleading statements contained in the warrant affidavits were repeated to the grand jury and thus give rise to a motion to dismiss the indictment based on prosecutorial

misconduct." (Suppl. Mem. 13-14.)  The Court finds that Ms. An is not entitled to disclosure of the grand jury minutes because she has not shown a particularized need.  Because the Court found that Agent Moritz's statements in the Apple and residence warrants were not law enforcement misconduct, (*see supra* 44-50), the Court accordingly does not find that it would have been prosecutorial misconduct to elicit testimony repeating those statements to the grand jury.  Thus, the Court respectfully denies Ms. An's motion to disclose the grand jury minutes.

### Conclusion

For the reasons above, the Court respectfully denies the Ans' motion to dismiss Count Eight, grants their motion to sever Count Eight, denies Ms. An's motion to suppress and alternative request for a *Franks* hearing, and denies Ms. An's motion to disclose the grand jury minutes.

**So ordered.**

Dated:    May 7, 2024
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York